# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 15, 2000 Session

## STATE OF TENNESSEE v. VINCENT SIMS

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 96-09279, 96-09280     Joseph B. Dailey, Judge**

---

### No. W1998-00634-SC-DDT-DD - Filed April 17, 2001

---

Vincent Sims was convicted of especially aggravated burglary and first degree premeditated murder in the shooting death of Forrest Smith. Sims was sentenced to twenty years on the especially aggravated burglary conviction and was sentenced to death for the first degree murder conviction. The sentences were ordered to run consecutively. On direct appeal, the Court of Criminal Appeals affirmed Sims's convictions and sentences. We entered an order designating the following issues for oral argument:[1]  1) whether the evidence is sufficient to support the verdict of first degree premeditated murder; 2) whether the trial court erred in refusing to charge the law of self-defense; 3) whether the record supports the aggravating circumstance that the defendant had been previously convicted of a felony whose statutory elements involve violence to the person; 4) whether the trial court erred in allowing the State to cross-examine defense witnesses at the sentencing hearing about the defendant's prior criminal convictions; 5) whether the trial court erred in refusing to allow the defendant to present hearsay evidence at the sentencing hearing; 6) whether prosecutorial misconduct during closing argument at the sentencing phase of the trial denied the defendant his constitutional rights; 7) whether the evidence is sufficient to support aggravating circumstance (i)(5), that the murder is especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; 8) whether the jury instruction on aggravating circumstance (i)(5) denied the defendant his constitutional right to a unanimous jury finding; and 9) whether the sentence should be upheld under the Court's mandatory review under Tenn. Code Ann. § 39-13-206(c)(1). Having carefully reviewed these issues and the remainder of the issues addressed in Sims's brief, we find no merit to his arguments. Sims raises no assignments of error related to his especially aggravated burglary conviction, and after careful review of the record we find no plain error requiring reversal of that conviction. Accordingly, we affirm the Court of Criminal Appeals in all respects.

---

[1]"Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument. . . ." Tenn. R. Sup. Ct. 12.2.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal;
Judgment of the Court of Criminal Appeals Affirmed.**

JANICE M. HOLDER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and FRANK F. DROWOTA, III and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., dissenting.

W. Mark Ward and Tony N. Brayton, Memphis, Tennessee, for the appellant, Vincent Sims.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Joseph F. Whalen, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On April 5, 1996, Forrest Smith arrived home from work around 10:00 p.m. He found the appellant, Vincent Sims, and Sims's cousin, Brian Mitchell, in the process of burglarizing his home. Mitchell testified that Sims had called him earlier in the evening asking for help in moving a big screen television from a house Sims had burglarized. Sims picked up Mitchell in a borrowed Toyota Camry belonging to Sims's girlfriend. They drove to Smith's house, parked the car under the carport, and loaded the big screen television in the trunk. Sims and Mitchell were in the house disconnecting a computer when Smith arrived. Smith parked his Jeep in the driveway to block the other vehicle's exit. When Smith entered the house, Sims and Mitchell ran outside but were unable to get the Camry out of the driveway. Sims went back into the house while Mitchell remained outside.

Mitchell testified that he heard Sims yelling at Smith to give Sims the keys to the Jeep. Mitchell then heard eight or nine gunshots fired inside the house. Sims returned carrying Smith's .380 caliber chrome pistol and the keys to the Jeep. Sims was holding his side and told Mitchell that he had been shot. Sims threw Mitchell the keys to move the Jeep, and the two fled the scene in the Camry. Mitchell testified that Sims told him that Sims and Smith had fought over the .380 caliber pistol and that Sims had shot Smith. Sims told Mitchell that Sims had to kill Smith because Smith had seen Sims's face. Sims instructed Mitchell not to talk to anyone about what had happened and later threatened Mitchell's life after they were in custody.

Smith's girlfriend, Patricia Henson, arrived at the home shortly after the shooting, sometime between 10:00 and 10:30 p.m. Smith was lying on the kitchen floor in a pool of blood, but he was conscious and asked Henson to call 911. When asked what had happened, Smith was able to tell Henson and Officer Donald Crowe that there had been a robbery and that Smith had been shot in the head. Officer Crowe testified that Smith was bleeding from several parts of his body, appeared to have been shot more than once, and was in severe pain. After receiving treatment by paramedics on the scene, Smith was transported to the hospital. He died approximately four and a half hours later.

In the meantime, Sims took Mitchell home and picked up Sims's girlfriend, Tiffany Maxwell, from work after she clocked out at 11:05 p.m. Maxwell testified that Sims was visibly upset and had blood on his shirt. Upon inquiry, Sims told her that someone had attempted to rob him. Maxwell also noticed that he had a "deep scar" injury on his side, which she treated herself after Sims refused to go to the hospital. The following morning, Sims and Maxwell took Maxwell's car to be washed and detailed. Maxwell then noticed that the license plate frame on her car was broken. Sims and Maxwell attended an Easter Sunday church service the next morning. According to Maxwell, Sims behaved normally with nothing unusual occurring until the following Tuesday when Sims was arrested at Maxwell's place of employment.

After Sims and Mitchell were in custody, Sims gave Mitchell a letter to deliver to Mitchell's attorney. In that letter, Sims recalled the events surrounding the burglary and murder. Sims alleged that Smith had fired at Sims and Mitchell as they fled the house. Mitchell testified that this portion of the letter was untrue. Mitchell maintained that no shots were fired until Sims went back inside the house to get Smith's keys to the Jeep. Sims also contended in the letter that Smith was accidentally shot in the head while the two struggled over the .380 caliber pistol.

Significantly, however, the bullet removed from Smith's brain was a .22 caliber bullet. The police also recovered fragments from three or four .22 caliber bullets at the scene. Mitchell testified that he had seen Sims with a long barrel .22 caliber revolver with a brown handle earlier in the evening. Although Mitchell did not see Sims with the revolver during the burglary, he did see something protruding under Sims's shirt. In addition to the .22 caliber bullets, the police found a bullet fragment from a probable .380 caliber bullet and five fired .380 caliber cartridge cases at the scene. Officers also recovered from Smith's carport a beeper that was later identified as belonging to Sims and the broken license plate frame from Maxwell's car.

Forensic pathologist Wendy Gunther performed the autopsy on Smith. She testified that Smith suffered a gunshot entry and exit wound to his head. Part of the bullet entered Smith's brain and lodged in his skull above his right eye, and the other piece exited in front of his right ear. Smith also suffered multiple blows to his head, neck, shoulders, arms, sides, back, and buttocks. The bruising indicated that Smith had been struck with a long, narrow, rod-shaped object at least a quarter inch wide. Dr. Gunther estimated that Smith had been struck at least ten times but probably many more. She stated that the blows were very hard as evidenced by the immediate bruising on Smith's body. Smith suffered at least six blows to his head, one of which fractured his skull at the back of his head. Dr. Steven Symes, a forensic anthropologist, opined that this head injury was inflicted after the gunshot wound to Smith's head. Although the gunshot wound to the head was the worst injury and would by itself have caused death, Dr. Gunther testified that the cause of death was a combination of all of the injuries.

Based upon the above evidence, the jury convicted Sims of especially aggravated burglary and first degree premeditated murder. Trial then proceeded to the penalty stage. The State presented evidence through Jennifer Gadd, an employee with the Criminal Court Clerk's Office, that Sims had

two prior convictions for aggravated assault. The State also submitted all evidence from the guilt phase in support of its position in the penalty phase.

The defense presented five mitigation witnesses, Sims's mother, father, brother, and two aunts. These family members testified that Sims was a good child who never got into trouble until sometime in his teens. They also testified that Sims had close relationships with his family. One of his aunts, Mary Gardner, worked at the Shelby County Correctional Facility and testified that Sims was a model prisoner while incarcerated there. On cross-examination the State was allowed to question the mitigation witnesses regarding Sims's prior convictions for theft in 1990, aggravated assault in 1991, and aggravated burglary in 1993.

The jury returned its verdict finding the following aggravating circumstances: 1) the defendant was previously convicted of one or more felonies involving the use of violence against a person; 2) the murder was especially heinous, atrocious, or cruel; 3) the murder was committed for the purpose of avoiding, interfering with, or preventing the arrest or prosecution of the defendant; and 4) the murder was committed during the commission of a burglary or theft. Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7). The jury found that these aggravating factors outweighed any mitigating circumstances and sentenced Sims to death.

## SUFFICIENCY OF EVIDENCE OF PREMEDITATION

Sims was convicted of first degree murder under Tenn. Code Ann. § 39-13-202(a)(1), defined as "[a] premeditated and intentional killing of another." Sims maintains that the State failed to prove the element of premeditation beyond a reasonable doubt. In reviewing the sufficiency of the evidence, we must examine all of the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the element of premeditation beyond a reasonable doubt. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998); State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997). The statute gives the following definition of premeditation:

As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

Sims's contention is that there is no evidence that he had a preconceived plan to kill during the course of the burglary. Particularly, he asserts that the State's evidence was insufficient to justify a finding that Sims acted free from passion and excitement because Smith was shot during a struggle.

-4-

We find, however, that taking the evidence in the light most favorable to the State, the evidence is sufficient to establish premeditation. "Evidence of procurement of a weapon is probative to prove premeditation." State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997). We have also held that establishment of a motive for the killing is another factor from which the jury may infer premeditation. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). A rational trier of fact could find from Mitchell's testimony that Sims's motive in shooting Smith was to prevent Smith from identifying Sims as the perpetrator of the crime. Moreover, the repeated blows to Smith's body, evidencing the particularly brutal nature of the killing, are supportive of the jury's finding of premeditation. See State v. Banks, 564 S.W.2d 947, 950 (Tenn.1978) (evidence of repeated blows inflicted upon the victim is relevant to establish premeditation). But see State v. Brown, 836 S.W.2d 530, 541-43 (Tenn. 1992) (the infliction of repeated blows to the victim is not alone sufficient to establish premeditation).

Mitchell indicated that he and Sims sat quietly listening to music in the car when they left Smith's house. Maxwell's testimony revealed that Sims picked her up from work following the shooting, went home, and went to sleep that night. "Calmness immediately following a killing is evidence of a cool, dispassionate, premeditated murder." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Moreover, the fact that Sims appeared agitated to both Mitchell and Maxwell on the night following the murder does not preclude a finding of premeditation. See State v. Gentry, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993).

Sims acted with determination to burglarize Smith's home and to avoid being identified as the perpetrator. Sims intentionally killed Smith to eliminate Smith as a witness to the crime. We find that the evidence, examined in the light most favorable to the State, shows that Sims acted with premeditation.

## SELF-DEFENSE INSTRUCTIONS

Sims contends that the trial court's instructions to the jury on self-defense were inadequate. The trial court denied Sims's request that the jury be charged on the general law of self-defense. The trial court found that no version of the facts supported a finding of lawful self-defense. The trial court instead instructed the jury under Tenn. Code Ann. § 39-11-611(b), as follows:

> Any person using force intended or likely to cause death or serious bodily injury within their own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Sims maintains that the trial court's instructions distorted the law and prevented the jury from considering his theory of defense.

"The general principle in criminal cases is that there is a duty upon the trial judge to give a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975). In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense. Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998). When the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying a special instruction requested by a party or in denying an inaccurate instruction or one inapplicable to the case at hand. State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

Sims argues that there was sufficient evidence presented to give rise to an inference that he was attempting to abandon the burglary and that he killed Smith in self-defense.

The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

(1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

(2) The other nevertheless continues or attempts to use unlawful force against the person.

Tenn. Code Ann. § 39-11-611(d). There is no dispute that Sims provoked the use of lethal force in this case by burglarizing Smith's home. The question is whether Sims abandoned the encounter and Smith continued or attempted to use unlawful force against Sims.

In Sims's version of the events, set forth in his letter, Smith began shooting at Sims and Mitchell as they ran out of the house, and Smith was accidently shot in a struggle over Smith's gun. Reasonable minds could not accept this version of events. The bullet retrieved from Smith's brain was not fired from Smith's gun, and Smith was shot in the back of the head.

Even accepting Sims's letter as true, there simply is no basis for finding that Sims attempted to abandon the encounter in this case. Sims's recitation that he engaged in a struggle with Smith over Smith's gun, rather than retreating, negates Sims's theory of any attempt to abandon the burglary. We hold that the trial court was correct in finding that the evidence did not support the requested instruction on self-defense.

We find, however, that the trial court erred in giving an instruction addressing the presumption that a resident employs self-defense. The Court of Criminal Appeals addressed this issue in State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). The court held that the § 39-11-611(b) instruction should not have been given when the victim, not the defendant, was

acting in defense of his residence. Id. at 781-82. The court found the error harmless, however, because the trial court charged the jury on the applicable self-defense statute. Id. at 783. The trial court further instructed the jury on the State's burden to prove beyond a reasonable doubt that the defendant had not acted in self-defense. Id. As a result, the Court of Criminal Appeals held that the burden of proof was not improperly shifted to the defendant. Id.

We agree with the reasoning of the Court of Criminal Appeals in Belser. Tennessee's self-defense statute falls under Title 39, Chapter 11, Part 6 of the Tennessee Code, addressing "Justification Excluding Criminal Responsibility." The first statute under Part 6 states, "It is a defense to prosecution that the conduct of the person is justified under this part." Tenn. Code Ann. § 39-11-601 (emphasis added). Self-defense is a justification, see Tenn. Code Ann. § 39-11-611, and may therefore be used as a defense to prosecution. Self-defense is not, however, justification for a victim's conduct. Belser, 945 S.W.2d at 782.

We recognize that the trial court granted the instruction based upon the defendant's opening statement that the shooting was an accident caused by the victim's error in judgment. Although we understand the intent of the State and of the trial court in using the instruction, the facts in this case did not warrant use of an instruction concerning the use of self-defense by Smith. We agree, however, with the Court of Criminal Appeals that the error was harmless. The State carries the burden of proving that the defendant did not act in self-defense. Belser, 945 S.W.2d at 782. The court in Belser noted that the danger created by improper use of the resident self-defense instruction was that the burden of proof was improperly shifted to the defendant. Id. Sims was not entitled to an instruction on self-defense. The error of granting the § 39-11-611(b) instruction was therefore rendered harmless.

## SUFFICIENCY OF EVIDENCE ESTABLISHING
## "PRIOR VIOLENT FELONY" AGGRAVATING CIRCUMSTANCE

The State presented evidence during the penalty phase of Sims's trial to establish that he was convicted in 1991 of two counts of aggravated assault. Based upon this evidence, the jury found that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2). Sims complains that the State's use of the prior violent felony aggravator was improper because the statutory elements of aggravated assault do not necessarily involve the use of violence.

Sims previously pleaded guilty and was convicted of aggravated assault under Tenn. Code Ann. § 39-13-102, which states in pertinent part:

(a) A person commits aggravated assault who:

(1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
. . . .

(B) Uses or displays a deadly weapon . . . .

The trial judge found that aggravated assault under this subsection does not necessarily involve the use of violence to another person. The offense may be committed by intentionally or knowingly causing the victim to reasonably fear imminent bodily injury[2] by use or display of a deadly weapon. In fact, the indictment charged that Sims placed two people in reasonable fear of imminent bodily injury by using a pistol. The facts outlined in the affidavit of complaint revealed that Sims fired two shots into another vehicle while riding in a car in the parking lot of a high school. Two people in the other vehicle were struck by the bullets fired by Sims, neither victim suffering critical injuries. The trial judge considered these underlying facts outside of the jury's presence. The judge then allowed the State to present evidence to the jury that Sims was convicted previously of two counts of aggravated assault. The court also instructed the jury that those aggravated assaults were felonies involving the use of violence to the person.

Sims maintains that the trial judge erred in reviewing evidence of the underlying facts of Sims's prior convictions to determine that the felonies involved the use of violence to the person. Sims asserts that the statutory definition of the prior violent felony aggravator only permits an examination of the statutory elements of the felony without regard for the facts in a particular case. This is an issue of first impression in Tennessee.

"A basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." State v. Fitz, 19 S.W.3d 213, 216 (Tenn. 2000). "[P]rovisions of [the criminal code] shall be construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39-11-104. "Moreover, we will not apply a particular interpretation to a statute if that interpretation would yield an absurd result." State v. Fleming, 19 S.W.3d 195, 197 (Tenn. 2000).

In State v. Moore, 614 S.W.2d 348, 351 (Tenn. 1981), this Court was faced with a similar question regarding whether burglary in the second degree and arson constituted felonies involving the use or threat of violence to the person. The language of the prior violent felony aggravator at the time Moore was decided read, "The defendant was previously convicted of one or more felonies, other than the present charge, which involves the use or threat of violence to the person." Tenn. Code Ann. § 39-2404(i)(2). Because both crimes could be committed under circumstances either involving or not involving the use or threat of violence, the Court looked to the evidence underlying each prior felony. Moore, 614 S.W.2d at 351. The trial judge heard testimony from the defendant's father and statements from the district attorney general showing that the defendant had been convicted of burglarizing and setting fire to a vacant house. Id. Based upon the underlying evidence, this Court held that there was insufficient evidence to support application of the prior violent felony aggravator. Id. The Court further instructed that the State must "show that there was in fact either violence to another or the threat thereof." Id. (emphasis added). Although the legislature has

---

[2]Tenn. Code Ann. § 39-13-101(a)(2).

-8-

amended the language of § 39-13-204(i)(2) to require that the statutory elements of the prior felony involve the use of violence to the person, we find the approach taken in Moore helpful in reaching a decision in this case.

In determining whether the statutory elements of a prior felony conviction involve the use of violence against the person for purposes of § 39-13-204(i)(2), we hold that the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied either with or without proof of violence. To hold otherwise would yield an absurd result, the particular facts of this case being an ideal example. A plain reading of the statute indicates that the legislature intended to allow juries to consider a defendant's prior violent crimes in reaching a decision during the sentencing phase of a first degree murder trial. The underlying facts of Sims's prior felony convictions involve his shooting two people sitting in a car. To hold that these prior convictions do not involve use of violence against a person would be an absurd result contrary to the objectives of the criminal code. We cannot adhere to a result so clearly opposing legislative intent.

The approach to this issue taken by the trial judge was carefully contemplated and achieved a fair result. The evidence was sufficient to support the jury's finding of the prior violent felony aggravator. We therefore find no error in its application in this case.

IMPEACHMENT OF MITIGATION WITNESSES

During the penalty phase, Sims presented mitigation testimony from five family members. His mother testified that Sims worked continually, was married with two children, and enjoyed spending time with his family. She also testified that Sims never got into trouble until he was a teenager. Mrs. Sims then related what she had heard about the shooting incident at the high school leading to Sims's convictions for aggravated assault. In her version, another passenger in the vehicle tossed the gun to Sims and it then fired accidentally. The State questioned her further on cross-examination regarding that shooting incident.

Sims's father testified that Sims was a good child, was not disrespectful of his parents, was not involved in many fights growing up, and was not an aggressive person. Sims was teased because he was small, so Sims's father tried to teach him to fight back instead of running to his older brother. Sims's father testified that Sims started defending himself when he was released from jail. He then described an incident in which Sims intervened in an altercation on behalf of his brother and was shot. Sims's father also corroborated Sims's mother's testimony that Sims was always working or spending time with family.

Before the State's cross-examination of Sims's father, the trial court conducted a bench conference. The trial court consequently allowed the State to impeach the character evidence offered during the father's testimony by asking if he knew about Sims's prior convictions for theft, aggravated assault, and aggravated burglary. The State also cross-examined Sims's brother and two aunts using the prior convictions to impeach their mitigating testimony. The prior convictions were

a theme of the prosecutor's closing argument. The prosecutor pointed out the progression of Sims's crimes, telling the jury that it was Sims's "graduation day."

Sims argues that the testimony presented by his mitigation witnesses was not character evidence subject to the impeachment allowed by the trial court in this case. Alternatively, Sims maintains that the evidence was limited to his childhood character so that the prior convictions were not relevant impeachment. He further argues that the trial court erred by failing to weigh the probative value of the evidence against its prejudicial effect.

The admissibility of evidence during a first degree murder sentencing phase is governed primarily by Tenn. Code Ann. § 39-13-204(c), which at the time of Sims's trial stated:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Sims's arguments are taken from Tenn. R. Evid. 405. Upon application to the trial court, this rule allows inquiry on cross-examination into specific instances of conduct relating to character. Tenn. R. Evid. 405. Before the specific instances of conduct may be admitted, however, the trial court must conduct a hearing outside of the jury's presence to determine "that a reasonable factual basis exists for the inquiry." Id. The court must also conclude "that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues." Id.

Our initial inquiry is whether § 39-13-204(c) precludes application of Tenn. R. Evid. 405 during the penalty phase of a first degree murder trial. This Court has said, "This statute expressly exempts evidence adduced in capital sentencing proceedings from the usual evidentiary rules." State v. Odom, 928 S.W.2d 18, 28 (Tenn. 1996); see also Van Tran v. State, 6 S.W.3d 257, 271 (Tenn. 1999) (rules of evidence do not limit the admissibility of evidence at capital sentencing). This Court has refrained, however, from holding that all evidence related to punishment is admissible without further inquiry. In Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979), we stated, "[E]vidence is relevant to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant." We have gone on to hold, however, that evidence regarding the nature and circumstances of the crime or relating to the defendant's

character and background is admissible regardless of its relevance to any aggravating or mitigating circumstance. State v. Nesbit, 978 S.W.2d 872, 890 (Tenn. 1998). This conclusion is necessary to meet the constitutional requirement that sentencing be conducted in an individualized manner. Id.

When addressing the admissibility of victim impact evidence, this Court has applied Tenn. R. Evid. 403 to restrict testimony by requiring that evidence whose probative value is outweighed by its prejudicial effect should be excluded. Nesbit, 978 S.W.2d at 890; State v. Morris, 24 S.W.3d 788, 813 (Tenn. 2000); State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998). Also, in State v. Hall, 958 S.W.2d 679 (Tenn. 1997), this Court cited Tenn. R. Evid. 103 in support of its position that the exclusion of certain mitigating evidence during sentencing was proper because no proffer was made. More closely related to this case, we have looked to Tenn. R. Evid. 404(b) in holding that evidence of the defendant's prior assault conviction was admissible to rebut evidence that the defendant was a docile person. State v. Nichols, 877 S.W.2d 722, 732 (Tenn. 1994).

These cases lead us to conclude that, in general, § 39-13-204(c) should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing. The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

In the current case, we hold that the trial judge was not required to strictly follow the Tennessee Rules of Evidence in determining whether the State should be allowed to question the defense's mitigation witnesses regarding Sims's prior convictions. The issue is not whether the testimony of Sims's father was character evidence under Tenn. R. Evid. 404 and 405. The focus should have been on the relevance of Sims's father's testimony to the mitigating factors presented by the defendant and on the relevance of Sims's prior convictions to refute those mitigating circumstances. One of the points raised in the testimony of both Sims's father and brother on direct examination was that Sims was not by nature an aggressive person and instead had to be encouraged by his family to defend himself. As indicated in Nichols, 877 S.W.2d at 732, and in State v. Moore, 614 S.W.2d 348, 352 (Tenn. 1981), prior convictions may be admissible to rebut this type of mitigating evidence related to the defendant's general character as a non-violent person. Even when the prior crimes do not endanger other persons, evidence of serious prior criminal activity may be admitted to contradict the defense's assertion that the defendant has no violent tendencies. Moore, 614 S.W.2d at 352. Sims's prior convictions were therefore relevant to rebut the mitigating testimony that Sims was not an aggressive person.

First, however, the trial judge should have determined whether the probative value of the prior convictions outweighed any prejudicial effect. See Nichols, 877 S.W.2d at 732. This weighing process is imperative when evidence proffered by the State has the potential to inflame the jury or interject arbitrary, non-statutory aggravating circumstances into the sentencing process. Based upon our independent review, we hold that any error on the part of the trial judge in failing to follow this procedure was harmless. Evidence of Sims's two 1991 aggravated assault convictions was already in evidence, properly argued by the State, and appropriately considered by the jury under the prior violent felony aggravating circumstance. The State did not ask specific questions regarding the underlying facts of the theft and aggravated burglary convictions. Any prejudicial effect in the jury's consideration of the prior convictions was outweighed by its probative value.

Finally, a proper limiting instruction should normally be given before allowing the jury to consider evidence of prior convictions. See Nichols, 877 S.W.2d at 732. The limiting instruction in this case would have informed the jury that the prior convictions could be considered solely for the purpose of rebutting the mitigating testimony related to Sims's character as a non-aggressive person. Such an instruction would have decreased the danger of inserting a non-statutory aggravating circumstance into the jury's deliberations. Sims did not, however, request a limiting instruction. We conclude that the failure to grant sua sponte a limiting instruction in this case did not amount to fundamental or prejudicial error. See State v. Howell, 868 S.W.2d 238, 255 (Tenn. 1993) (reversal should be "limited to those exceptional cases in which the impeaching testimony is extremely damaging, the need for a limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused.").

## EXCLUSION OF MITIGATING HEARSAY EVIDENCE

During the penalty phase, the defense asked Sims's mother if she had spoken with Sims regarding this incident. When she answered in the affirmative, the defense began to ask her, "Has he expressed–" to which the trial judge sustained the State's objection on grounds that her statement was hearsay and self-serving. Sims argues on appeal that this limitation on mitigating evidence of remorse was improper. We agree that otherwise admissible evidence should not be excluded during a capital sentencing hearing based upon the fact that it is hearsay. Odom, 928 S.W.2d at 28. However, we agree with the Court of Criminal Appeals that Sims has waived this issue for failure to make an offer of proof or to raise this assignment of error in his motion for a new trial. Tenn. R. App. P. 3(e), 36(a); State v. Hall, 958 S.W.2d 679, 714 (Tenn. 1997); State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995).

We also decline Sims's request to follow the procedure outlined in State v. Goad, 707 S.W.2d 846 (Tenn. 1986). In Goad, the trial court inappropriately limited the defendant's offer of proof, and we remanded the case for further development of the record. Id. at 853. Here, the defendant made no proffer. The issue is therefore waived.

-12-

## PROSECUTORIAL MISCONDUCT

During closing argument, the prosecutor made the following statement:

> The only verdict that is proper in this case and again, I do not say this to demean your job, but the only proper verdict that this defendant has earned, that he deserves, that all his life he's been crying out for, sentence me to death, because if you don't stop me, if you don't stop me, I'm going to take somebody else away from you. I'm going to take away a valued member of this community if you don't stop me.

Sims contends that this specific deterrence argument inserted a non-statutory aggravating circumstance into the jury's deliberations on sentencing in violation of Tenn. Code Ann. § 39-13-204. He maintains that the improper argument created a "'substantial risk that [the death penalty] would be inflicted in an arbitrary or capricious manner.'" Cozzolino, 584 S.W.2d at 768 (quoting Gregg v. Georgia, 428 U.S. 153, 188 (1976)). Generally, prosecutors should avoid arguing specific deterrence during the penalty phase of a capital case because the argument is not relevant to any of the aggravating circumstances specified by the legislature in Tenn. Code Ann. § 39-13-204(i). State v. Bates, 804 S.W.2d 868, 881-82 (Tenn. 1991). However, we hold that Sims has waived this issue by failing to raise a contemporaneous objection to the prosecutor's statement at trial. Tenn. R. App. P. 36(a); State v. Carruthers, 35 S.W.3d 516, 580 (Tenn. 2000).

Our review of the record, moreover, convinces us that any error in permitting these comments was harmless. We agree with the Court of Criminal Appeals that these limited comments by the prosecutor did not affect the jury's sentencing decision in light of the facts and circumstances of this case. See State v. Irick, 762 S.W.2d 121, 130-31 (Tenn. 1988) (to meet Eighth Amendment standard of reliability, review of improper specific deterrence argument requires determination of whether the comments affected the sentencing decision). In making this determination, we have considered the following:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000). Although the comment about which Sims complains was an attempt to improperly sway the jury, it was brief and isolated. No objection was raised, and thus no curative action was taken. The cumulative effect of the improper conduct of the prosecutor was far outweighed by the strength of the evidence that supported the jury's finding that the aggravating circumstances outweighed proof of any mitigating factors. We conclude that the prosecutor's conduct does not mandate reversal.

## SUFFICIENCY OF EVIDENCE OF
## "HEINOUS, ATROCIOUS, OR CRUEL" AGGRAVATOR

The jury found that the murder in this case was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). Sims maintains that the evidence was insufficient to support the "heinous, atrocious, or cruel" aggravator in this case.

"In determining whether the evidence supports a jury's finding of a statutory aggravating circumstance, the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000). We have held that the (i)(5) aggravating circumstance may be appropriately applied when the evidence supports a finding of either "torture" or "serious physical abuse beyond that necessary to produce death." Id. "Torture" is defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998). Regarding the "serious physical abuse" prong in the language of the aggravating circumstance, we have stated:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

Odom, 928 S.W.2d at 26.

The evidence showed that Smith sustained a gunshot wound to the back of his head. Smith also suffered multiple blows to the head, neck, shoulders, arms, sides, back, and buttocks. The bruising indicated that Smith had been struck with a long, narrow, rod-shaped object at least a quarter of an inch wide, presumably the barrel of Sims's gun. Dr. Gunther estimated that Smith had been struck at least ten times, with at least six blows to his head. In her opinion, however, Smith was probably hit many more times. One of the head blows fractured Smith's skull at the back of his head, and some of the blows to the head caused bleeding on his brain. Dr. Gunther also stated that the blows were very hard as evidenced by the immediate bruising on Smith's body.

No opinion was offered as to whether Smith was conscious during the beating, but he was conscious when his girlfriend returned home shortly thereafter. Officer Crowe testified that Smith was conscious and in a lot of pain when the officer arrived on the scene. Based upon Dr. Gunther's testimony regarding the nature of the bruising on Smith's upper arms, back, and head, the jury could have concluded that Smith was conscious and using his arms in an attempt to defend himself. While the gunshot wound to the back of his head was the most serious injury and alone would have caused

death, Dr. Gunther opined that Smith died from a combination of all of his injuries, the multiple blows to his head and upper body contributing to his death.

Considering the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support a finding of both torture and serious physical abuse beyond that necessary to produce death. A rational trier of fact could find that Smith was severely pistol whipped and shot in the head, remaining conscious and in pain until after police arrived on the scene. We hold that this evidence supports a finding of torture in this case. See State v. Hall, 8 S.W.3d 593, 601 (Tenn. 1999) (extent and severity of beating support finding of either torture or serious physical abuse beyond that necessary to produce death due to pain suffered before death); Barber v. State, 889 S.W.2d 185, 188-89 (Tenn. 1994) (evidence that victim was struck with a wrench with at least five blows to the head and defensive posturing injuries on the back of her hands supported finding of torture); State v. Porterfield, 746 S.W.2d 441, 450-51 (Tenn. 1988) ("the infliction of heavy, repeated, and vicious blows to a helpless, conscious victim" supported finding of torture).

Moreover, the multiple blows to Smith's body in addition to the gunshot wound to his head amount to excessive, gratuitous violence upon the victim. We therefore hold that the evidence also supported a finding that Smith was subjected to serious physical abuse beyond that necessary to produce death. See Hall, 8 S.W.3d at 601; State v. Bivens, 967 S.W.2d 821, 825 (Tenn. Crim. App. 1996) ("multiplicity of the wounds beyond that necessary to cause death and the wanton infliction of gratuitous violence" supported application of (i)(5) aggravator). After careful review, we hold that the evidence supported application of the (i)(5) aggravator in the current case.

## "HEINOUS, ATROCIOUS, OR CRUEL" AGGRAVATOR
## JURY INSTRUCTION

Sims argues that the jury instruction on the (i)(5) aggravator denied him his constitutional right to a unanimous jury verdict. Specifically, he contends that the jury should not have been instructed in the disjunctive form, permitting them to find that the murder involved "torture" or "serious physical abuse beyond that necessary to produce death." Because the jury returned its verdict in the same disjunctive form, Sims asserts that there is no way to know whether the jury unanimously agreed on either basis for finding the (i)(5) aggravator. We addressed and rejected the same argument in the recent case of State v. Keen, 31 S.W.3d 196, 208-10 (Tenn. 2000). For the reasons set forth in the Keen opinion, we find this issue to be without merit.

## PROPORTIONALITY REVIEW

We are bound by statute to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

-15-

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1). As previously discussed, we find the evidence sufficient to support application of both the prior violent felony and "heinous, atrocious, or cruel" aggravators in this case. We further hold that the State presented sufficient proof to uphold the jury's finding that the murder was committed for the purpose of avoiding, interfering with or preventing the arrest or prosecution of the defendant. This aggravator was amply supported by Mitchell's testimony that Sims said he had to kill Smith because Smith had seen Sims's face. There was also sufficient evidence presented for the jury to find that Sims and Mitchell were engaged in burglarizing Smith's home when the killing occurred, thereby supporting the State's fourth aggravating circumstance. Having thoroughly reviewed the record, we find that the sentence of death was not imposed in any arbitrary fashion and that the evidence supports the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

We next are compelled to consider whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D).

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in choosing and comparing cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. Id. In comparing defendants, we consider the following traits: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of the victim; and 8) capacity for rehabilitation. Id.

-16-

In the current case, the victim was shot in the back of the head. He was severely beaten, presumably with the defendant's gun, causing both extensive bruising and a skull fracture with bleeding on his brain. The murder was committed during the burglary of the victim's home. The motive for the killing was to prevent the victim from identifying the defendant. The murder was premeditated, and no evidence was presented to show either provocation or justification.

Sims, an African-American male, was twenty-four-years old at the time of the murder and had a prior criminal history including two convictions for aggravated assault. The record does not reveal that Sims had any mental, emotional, or physical disabilities at the time of the crime. He was the sole perpetrator in the killing. No evidence was presented to show that Sims cooperated with the authorities or showed any remorse for the killing. Sims's aunt testified that he had been a model prisoner and participated in courses and programs in the correctional facility. His family also testified that Sims had maintained a record of employment. However, the evidence showed that Sims continued in a pattern of criminal conduct rather than becoming rehabilitated. Considering the nature of the crime and the defendant, we conclude that this murder places Sims into the class of defendants for whom the death penalty is an appropriate punishment.

Based upon an exhaustive review of the record and Rule 12 reports from trial judges in trials for first degree murder in which either life imprisonment or a sentence of death has been imposed, we conclude that the following cases in which the death penalty was imposed bear similarities with the current case. See King v. State, 992 S.W.2d 946 (Tenn. 1999) (defendant shot victim in the neck during robbery of a tavern); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998) (victim shot once in the head by twenty-three-year-old defendant when she and her husband returned home to find defendant and second assailant burglarizing their home); State v. Howell, 868 S.W.2d 238 (Tenn. 1993) (twenty-seven-year-old defendant shot victim in the head during robbery of a convenience store); State v. McCormick, 778 S.W.2d 48 (Tenn. 1989) (defendant killed victim by shooting her in the head to prevent her from disclosing evidence regarding defendant's participation in a prior burglary); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (victim struck at least five times in the head with a wrench during a home burglary); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (defendant went to victim's apartment to take money from her and beat her about the head and face with a flower vase causing multiple skull fractures); State v. King, 718 S.W.2d 241 (Tenn. 1986) (death sentence based upon same four aggravating circumstances found in this case), superseded by statute on other grounds as stated in State v. Hurchison, 898 S.W.2d 161, 173 n.11 (Tenn. 1994); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (defendant engaged in burglary struck victim with marble vase at least three times causing multiple skull fractures); State v. Caruthers, 676 S.W.2d 935 (Tenn. 1984) (death sentence based upon same four aggravating circumstances found in this case); State v. Campbell, 664 S.W.2d 281 (Tenn. 1984) (retirement home resident severely beaten about the head with a blunt object during the course of a robbery). After reviewing these cases, and many others not specifically cited, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are attached as an appendix. The defendant's sentence of death is affirmed and shall be carried out on the 31st day of August, 2001, unless otherwise ordered by this Court or proper authority. Finding no plain error related to Sims's conviction and sentence for especially aggravated burglary, we also affirm that conviction and sentence. It appearing that the defendant Vincent Sims is indigent, costs of this appeal are taxed to the State.

_____
JANICE M. HOLDER, JUSTICE