# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 9, 2003 Session

## STATE OF TENNESSEE v. DETRICK COLE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-01221     Joseph B. Dailey, Judge**

---

**No. W2002-01254-CCA-R3-DD  - Filed November 24, 2003**

---

Capital defendant Detrick Cole appeals as of right his sentence of death resulting from the October 2000 murder of Santeife Thomas. A Shelby County jury found the defendant guilty of premeditated first degree murder. Following a separate sentencing hearing, the jury unanimously found the presence of one statutory aggravating circumstance, *i.e.*, the defendant had previously been convicted of one or more violent felony offenses; determined that this aggravating circumstance outweighed any mitigating circumstances; and imposed a sentence of death. The defendant now appeals, presenting for our review the following issues: (1) whether the evidence is sufficient to support premeditated first degree murder; (2) whether the trial court erred in permitting the state to introduce a photograph of the victim while he was alive; (3) whether the trial court erred in permitting the introduction of post-mortem photographs of the victim; (4) whether the fingerprinting of the defendant in the presence of the jury at the penalty phase was constitutional error; (5) whether the trial court erroneously prohibited the defendant from introducing hearsay evidence during the penalty phase; (6) whether the trial court's instructions to the jury as to the (i)(2) aggravating circumstance were contrary to the United States Supreme Court's holdings in <u>Apprendi v. New Jersey</u> and <u>Ring v. Arizona</u>; (7) whether there is a reasonable probability that the instruction on victim impact evidence coerced the death sentence from the jury; (8) whether the evidence is sufficient to establish the defendant had previously been convicted of one or more violent felony offenses; (9) whether the jury verdict form was clear as to whether the jury found the aggravating circumstance relied upon by the state; (10) whether the Tennessee death penalty statutory scheme is constitutional; and (11) whether the sentence of death imposed in this case is disproportionate. Upon review, we question, but need not determine, whether the trial court in the penalty phase had the authority under <u>Apprendi</u> and <u>Ring</u> to find the defendant's prior felony convictions were crimes of violence and to instruct the jury that these prior convictions were crimes of violence; however, we conclude that if there were error, any error was harmless beyond a reasonable doubt. Thus, we discern no error of law requiring reversal. Accordingly, we affirm the defendant's conviction for first degree murder and the jury's imposition of the sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

Joe G. Riley, J., delivered the opinion of the court, in which Gary R. Wade, P.J., and Jerry L. Smith, J., joined.

Robert Wilson Jones, Public Defender; William L. Johnson (at trial), Dianne M. Thackery (at trial), W. Mark Ward (on appeal), Tony N. Brayton (on appeal), and Garland Erguden (on appeal), Assistant Public Defenders, for the appellant, Detrick Cole.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Guilt Phase Evidence*

Shortly after midnight on October 17, 2000, the defendant killed the victim by shooting him twice in the head. The homicide occurred in an overgrown, grassy area near an apartment complex, and the victim's body was not discovered until October 21st. Those facts are undisputed. The testimony at trial was as follows:

Between 1:00 a.m. and 2:30 a.m., on October 17, 2000, Marcus Puryear, who lived near the Garden Walk Apartments in Memphis, heard "two loud gunshots" while sitting in his vehicle. Puryear stated he then observed a speeding car which sounded like it had a "small four-cylinder engine." After he returned to his residence, he again heard what sounded like the same vehicle. He then observed two males exit the vehicle, a late model Mitsubishi Galant. They walked around in the bushes and weeds where he previously heard the gunshots, returned to their vehicle after three or four minutes, and left at a high rate of speed.

Fourteen-year-old Andropolis Wells testified that earlier that evening, he saw the defendant at the Ridgemont Apartments. Wells stated they stayed at the complex until the victim, twenty-seven-year-old Santeife Thomas, arrived in his vehicle. Wells said another man, "E," asked the victim for a ride to the Raleigh Woods Apartments and he and the defendant accompanied them. According to Wells, "E" exited the vehicle at Raleigh Woods and the defendant asked the victim to take him to the Garden Walk Apartments, where the defendant directed the victim to the back of the apartments near some bushes and high grass. Wells testified the defendant left briefly and, upon his return, said "Jerry" would bring them some crack cocaine.

Wells said he then heard the defendant repeatedly tell the victim to open his mouth and saw the defendant pointing a gun near the victim's face. Wells testified the victim did not have a weapon and had made no aggressive moves toward the defendant. Wells recounted that the victim told the defendant, "[S]top playing, man - stop playing" and backed up. Wells said he then heard two gunshots. Wells stated the defendant ran from the bushes holding a set of keys, but stated, "No, these the wrong keys – these the wrong keys." The defendant then ran back to the victim's body and returned with another set of keys. Wells testified the defendant ran toward the victim's car and

-2-

ordered Wells to enter it. Wells stated the defendant then drove the victim's car to the Ridgemont Apartments.

Wells said that upon arriving at the apartment complex, the defendant removed two shells from the gun and threw them into a garbage can. Wells testified the defendant then took the gun to a man in one of the apartments. According to Wells, the defendant instructed him to return with him to the victim's car. Wells stated that when they entered the car, the defendant said he had lost his electronic organizer and announced they must return to the scene and look for it. Wells said they returned to the Garden Walk Apartments, where they walked to the victim's body. The defendant rolled the body over while looking for his organizer. Wells said the defendant expressed concern that if he did not find the organizer, he would get caught; however, the search for the organizer was unsuccessful.

According to Wells, the defendant said he shot the victim because the victim owed him fifteen dollars. Wells then stated he would have given the defendant fifteen dollars; however, the defendant responded, "Nig--- gonna start respecting me."

Robert Eric Adams testified he saw the defendant on October 18, 2000. Adams stated the defendant told him the victim was taking him to meet someone regarding a drug transaction when he asked the victim about the money the victim owed him. Adams said that according to the defendant, the victim replied he would pay the defendant on Friday, but the defendant felt the victim was lying. Adams stated the defendant recounted that he asked the victim the same question three times, and when the victim failed to respond the last time, he shot him in the head. Adams said the defendant told him that the victim fell, but he shot him again because he did not believe he was dead.

Adams testified the defendant then requested a ride to the Garden Walk Apartments, and the defendant showed him the victim's body. Adams stated the defendant said he lost his electronic organizer; he began searching for it; and they left after the defendant found it.

Officer J. Taylor testified that on the morning of October 20th, he observed the defendant exiting a convenience store. Officer Taylor stated that during a routine check for weapons, he found the defendant possessed a Mitsubishi ignition key. Officer Taylor then transported the defendant to the homicide division for questioning. Officer Taylor stated that when he instructed the defendant to empty all of his belongings onto a table, the Mitsubishi ignition key was missing. Officers later searched the room and found the key under a chair.

Sergeant T.J. Helldorfer testified that after the defendant was advised of his rights, he said he found the key at the Ridgemont Apartment parking lot and, since he collected car keys, he took it. The defendant said he was aware that the victim had been reported missing but did not admit any involvement in the victim's disappearance. Sgt. Helldorfer said the defendant admitted concealing the car key under the cushion of a chair in the homicide office because "he had second thoughts about this key" after the officer questioned him. Sgt. Helldorfer stated the defendant was then released.

Sgt. Helldorfer testified the key unlocked the victim's Mitsubishi car. He stated the victim's car had blood on the door handle, and a piece of paper bearing the defendant's fingerprint was found inside the vehicle.

According to Sgt. Helldorfer, officers began to search for the defendant again, and when they located him, he made an obscene gesture and fled. Sgt. Helldorfer said the defendant later contacted police and stated he was going to turn himself in, but he failed to do so. Sgt. Helldorfer testified that after the defendant was subsequently arrested and again advised of his rights, he admitted his prior statement to the police was false. Sgt. Helldorfer stated the defendant admitted killing the victim and gave the following statement:

> On the night that [the victim] was murdered, it was me, [Wells], and [the victim]. We left the Ridgemont Terrace Apartments going to the Garden Walk where [the victim] told me that he had some money that he owed me and when we got down there, he stalled like telling me that he was waiting on the money but he never did get it. He told me that he gave me his key to his car as a partial payment [until] he could give me the money but when I turned down the key, we got into an argument, and he went on about that he wasn't going to pay me, and I asked him why but he never did say. So, he came in my face with threats that he wasn't going to pay me, and I could take it how I wanted to take it and I asked him why he wasn't going to pay me so that's when he went to [putting] his hands in my face and pushing me and then we started into a small argument of words back and forth and that's when he tried to attack me. I went into my pocket and pulled out a .38, and [the victim] rushed at me, and I shot him.

> After I shot him, I looked at his body and threw up. I still had his key in my left hand and I got in his car, and I left the crime scene with [Wells], and we went and parked the car and we got out at the Ridgemont Terrace Apartments.

> I went back to the body because I dropped my organizer, and I went to get it. And when I got it, I left and took his car and parked it again on Voltaire Street.

Sgt. Helldorfer stated the defendant said he committed the murder because the victim tried to attack him, and he needed the money owed by the victim to support himself and his pregnant girlfriend. According to Sgt. Helldorfer, the defendant said the victim was coming toward him from a distance of four to five feet away when he fired the shots. Sgt. Helldorfer testified the defendant admitted returning to the crime scene twice after the murder.

Officer Charles Hawk testified that while he was on patrol during the week following the victim's disappearance, he noticed the victim's Mitsubishi Galant parked at a dead-end street for four or five days. Officer Hawk stated the rear tag of the vehicle had been removed, and the vehicle identification number on the dash was covered.

Dr. Craig Mallak, a forensic pathologist who performed the autopsy on the victim, testified the victim was shot above the left eye and behind the left ear. Dr. Mallak further determined the

gunshot wound behind the victim's left ear was inflicted with the gun "less than an inch" from the victim's skin, and the wounds sustained by the victim were consistent with being inflicted by a large caliber bullet. He concluded either of the two gunshots would have been sufficient to cause the victim's death and opined the victim would have been immediately incapacitated upon the infliction of the first gunshot wound. Both Dr. Mallak and forensic anthropologist Dr. Steven Symes, the latter of whom reconstructed the victim's skull, concluded the frontal shot was inflicted first.

The defendant did not testify nor offer any proof during the guilt phase. The jury found the defendant guilty of premeditated first degree murder.

### *Penalty Phase Evidence*

During the penalty phase, the state presented proof that the defendant pled guilty in 1997 to robbery, kidnapping, felony reckless endangerment, and attempt to commit rape. All four convictions related to an incident which occurred in 1995. Darrell Webster, the victim of those offenses, testified at the penalty phase that in November 1995, the defendant and another man approached him as he was leaving an adult bookstore. Webster stated the other man initially pointed a gun at him but put away the gun and apologized; he then asked Webster for money to buy food.

Webster stated he bought the men a meal at a restaurant and agreed to give them a ride to a family member's house. He said that as he drove, the defendant pulled out a gun and forced Webster into the passenger seat to allow the other man to drive. Webster testified that when he pled for his life, the defendant responded, "Do you want to go out like a punk? You're crying. Go out like a man." Webster recalled the defendant spun the barrel of the gun, pointed the gun to Webster's head, and pulled the trigger; however, the gun did not fire. Webster testified the defendant later forced him to perform oral sex. The defendant and the co-perpetrator also informed Webster that they intended to "bust a cap" in him and dump his body. After this five-hour ordeal, Webster escaped from the vehicle. The defendant and his co-perpetrator were apprehended.

Marcie Turcios, the victim's half-sister, gave victim impact testimony relating to the effect of the victim's death upon her and other members of the family.

The defense presented the testimony of Roy Cole, the defendant's father. He stated the defendant, his middle child, lived with him until a few years ago. He averred the defendant regularly attended church with the family until 1996, when he left home. He stated the defendant left home because he would not abide by the family's rules. The defendant's father testified that the defendant loved his fourteen-month-old daughter and asked the jury to allow his son to live.

Cathy Cole, the defendant's mother, recalled that the defendant was fifteen years old at the time of the offenses leading to his 1997 felony convictions. She stated her son left home at age sixteen, and when he would return, she "welcomed him home - seemed like [she would] clean him up, . . . but [he would] slip through [her] fingers again." She also asked the jury to spare her son's life.

-5-

The twenty-two-year-old defendant denied that all of the facts alleged by the prosecution were true, but admitted he was responsible for the victim's death. The defendant expressed remorse and pled with the jury for mercy and the sparing of his life.

At the close of the proof, the jury was instructed on the following statutory aggravating circumstance and underlying convictions:

That the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involved the use of violence to the person. The state is relying upon the crimes of Robbery, Kidnapping, Reckless Endangerment, and Attempted Rape, which are felonies, the statutory elements of which do involve the use of violence to the person.

The jury was also given the following instruction on mitigating circumstances:

Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which shall include but are not limited to the following:

1. Any testimony that he is remorseful for killing [the victim].
2. Any testimony that he was twenty years old at the time of the murder.
3. Any testimony that he was only fifteen years old when he committed the offense that is being used as an aggravating circumstance.
4. Any testimony that he has a fourteen-month-old daughter.
5. Any testimony that he has a family that loves and supports him.
[6.] Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The jury found the state had proven beyond a reasonable doubt aggravating circumstance (i)(2), the defendant was previously convicted of one or more violent felonies other than the present charge. *See* Tenn. Code Ann. § 39-13-204(i)(2). The jury further found that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. The jury sentenced the defendant to death.

## I. SUFFICIENCY OF THE EVIDENCE

While the defendant concedes that he killed the victim and some circumstantial evidence of premeditation exists, he argues that the proof is insufficient to justify a finding beyond a reasonable doubt that the killing was premeditated.

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt; thus, a convicted defendant on appeal has the burden of

demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court on appeal to revisit questions of witness credibility, that function being within the province of the trier of fact. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979); Tenn. R. App. P. 13(e). Moreover, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). In State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), this court held these rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

The defendant was convicted of premeditated first degree murder. First degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) defines premeditation as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Although there is no strict standard governing what constitutes proof of premeditation, circumstances from which a jury may infer premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

In the present case, the proof established that the defendant asked the victim to go to a grassy area behind the apartment complex. Unsatisfied with the victim's refusal to pay a fifteen-dollar debt, the defendant pointed a gun at the unarmed victim and repeatedly ordered him to open his mouth. As the victim told the defendant to "stop playing" and backed away, the defendant shot him above the left eye and then shot him above the left ear from a distance of less than an inch in order to ensure he was dead. The proof showed the defendant retrieved the victim's car keys, left the victim in the grassy field, used the victim's car to make his escape, and discarded the weapon. The defendant returned to the scene twice to search for his electronic pocket organizer. The defendant later stated he wanted the victim to "start respecting me."

From this evidence, there are numerous circumstances from which the jury could conclude that the murder was premeditated. Viewing the evidence and inferences therefrom in a light most favorable to the state, this court concludes a rational trier of fact could find the defendant intentionally and premeditatedly killed the victim. This issue is without merit.

## II. PHOTOGRAPH OF VICTIM DURING LIFETIME

The defendant contests the admission of a portrait-style photograph of the victim taken during his lifetime, contending it was irrelevant and its probative value was substantially outweighed by the danger of unfair prejudice and confusion of issues. While the state concedes that the photograph may have added "little or nothing" to its case-in-chief, it claims the introduction of the photograph did not result in any prejudice to the defendant.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *See* State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). A family photograph may be relevant to establish the victim's identity as the person killed. *See* State v. Nesbit, 978 S.W.2d 872 app. at 902 (Tenn. 1998). We conclude the trial court did not err in admitting the photograph into evidence.

Regardless, even if the trial court erred, such error was harmless. In State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981), the defendant claimed "before and after" photographs of the victim were without relevance and were prejudicial. The court stated that it found no prejudicial error in the admission, "though it would have been better had the 'before' picture of [the victim] been excluded since it added little or nothing to the sum total of knowledge of the jury." *Id.* Likewise, in the instant case, although the photograph added little to the other information provided to the jury, it did not prejudice the defendant. This issue is without merit.

## III. POST-MORTEM PHOTOGRAPHS OF VICTIM

During the testimony of forensic pathologist Dr. Mallak, the state introduced two autopsy photographs depicting close-ups of the victim's scalp. Specifically, the photographs revealed a gray ring of soot around one wound indicating it was the result of a gunshot fired at close range. In response to the defendant's objection to the photographs, the state asserted they were relevant to show the distance between the gun and the victim when the gun was fired. The trial court permitted introduction of the photographs after it determined them to be relevant to the issue of premeditation, and after it cropped the photographs to show less of the victim's scalp. In this appeal, the defendant asserts that the close-up photographs of the victim's scalp should not have been admitted, as the photographs were especially gruesome and inflammatory.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. Banks, 564 S.W.2d at 949. Accordingly, "the admissibility of photographs lies within the discretion of the trial court whose ruling . . . will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.*; *see* State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999). However, a photograph must be found relevant to an issue that the jury must decide before it may

be admitted into evidence. *See* State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); *see also* Tenn. R. Evid. 401.

Photographs of a corpse are generally admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome character. State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003). Conversely, evidence which is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *Id.* at 951. "[P]hotographs of the victim may be admitted as evidence of the brutality of the attack and the extent of force used against the victim, from which the jury could infer malice." State v. Goss, 995 S.W.2d 617, 627 (Tenn. Crim. App. 1998); *see also* State v. Smith, 868 S.W.2d 561, 576 (Tenn. 1993) (holding photograph was relevant to show "premeditation"). The probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. Vann, 976 S.W.2d at 102; *see* Tenn. R. Evid. 403.

The trial court ultimately determined that the photographs were relevant and were not "particularly graphic." In this case, the state was required to prove that the killing was intentional and premeditated. *See* Tenn. Code Ann. § 39-13-202(a)(1). The photographs were relevant to supplement the testimony of the medical examiner that this wound was inflicted from contact range, from which a jury could infer premeditation, and not from a few feet away as claimed by the defendant during his statement to the police. Additionally, the photographs dispel the defendant's claim of self-defense. Further, the photographs are not particularly gruesome. We conclude that the probative value of the photographs is not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." *See* Banks, 564 S.W.2d at 953. The defendant is not entitled to relief on this issue.

## IV. FINGERPRINTING OF DEFENDANT IN PRESENCE OF JURY DURING PENALTY PHASE

The state sought the death penalty on the basis that the defendant was previously convicted of four felonies whose statutory elements involved the use of violence to the person. *See* Tenn. Code Ann. § 39-13-204(i)(2). During the penalty phase, the state's fingerprint technician took a thumb print from the defendant in the presence of the jury for the purpose of identifying him as the same person convicted in 1997 of robbery, kidnapping, felony reckless endangerment, and attempt to commit rape. When the defendant objected, the state offered to stipulate to the defendant's identity as the person named in the 1997 convictions; however, the defense refused to so stipulate. The trial court overruled the defendant's objection, noting that, absent a stipulation from the defense, the state was entitled to prove that the defendant was the person convicted of the prior offenses. On appeal, the defendant claims that fingerprinting him in the presence of the jury denied him his right to a fair trial and subjected him to a "humiliating and embarrassing procedure." We do not agree.

During the penalty phase of a capital case, the trial court retains its role in controlling the introduction of evidence. Carter, 114 S.W.3d at 903. While the trial court may use the rules of evidence to guide its decisions in this regard, those rules are relaxed. *See id.* Evidence may be

presented as to any matter that the court deems relevant to the punishment, including any evidence tending to establish or rebut any aggravating circumstances. *Id.*

The defendant maintains it was not necessary for the jury to observe the technician fingerprint him because, despite his refusal to stipulate identity, he was not contesting his identity as the person named in the four 1997 convictions. The state had the burden of proving beyond a reasonable doubt that the defendant was indeed the same person who was convicted of the prior offenses. Absent a stipulation, the state was required to present proof sufficient to meet this burden. We conclude the fingerprint evidence presented by the state, including a demonstration of the technician taking the defendant's thumb print, was highly relevant to the question of whether the defendant was the person convicted of the prior offenses.

The defendant does not argue the fingerprinting procedure violated his privilege against self-incrimination. Still, we observe the courts have long held that fingerprinting is non-testimonial evidence that is not subject to the privilege against self-incrimination. Schmerber v. California, 384 U.S. 757, 764, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966); *see generally* State v. Frasier, 914 S.W.2d 467, 472 (Tenn. 1996). Moreover, a number of federal and state courts have held that a defendant may be fingerprinted in the presence of the jury. *See, e.g.*, United States v. Peters, 687 F.2d 1295, 1297 (10th Cir. 1982); United States *ex rel* O'Halloran v. Rundle, 384 F.2d 997 (3rd Cir. 1967), *cert. denied,* 393 U.S. 860 (1968); People v. Montoya, 543 P.2d 514, 518 (Colo. 1975); State v. Stuard, 452 P.2d 98, 99 (Ariz. 1969); State v. Anderson, 528 P.2d 1003, 1005 (Wash. Ct. App. 1974).

The defendant contends that by taking his thumb print, the state engaged in a practice which "undermine[d] the presumption of innocence." Yet, at the time the jury saw the technician fingerprint the defendant, it had already convicted him of first degree murder. He was no longer presumed innocent.

A defendant's right to a fair trial may be infringed if he is forced to perform acts which would unjustly prejudice him. *See* United States v. Doremus, 414 F.2d 252, 253-54 (6th Cir. 1969); State v. Ronald Bradford Waller, No. E1999-02034-CCA-R3-PC, 2000 Tenn. Crim. App. LEXIS 558, at \*\*38-39 (Tenn. Crim. App. July 18, 2000, at Knoxville), *perm. to app. denied* (Tenn. 2001). Prejudice may arise in cases where the requested performance or demonstration would unjustly humiliate or degrade the defendant, or where such performance would be damaging to the defendant's image and is irrelevant to an issue at trial. Doremus, 414 F.2d at 254.

Fingerprinting, unlike being handcuffed or wearing an inmate's uniform, does not portray the defendant as a dangerous criminal. As noted by this court over twenty years ago, fingerprinting is a commonplace practice which "signifies neither criminality nor saintly living." State v. Tyson, 603 S.W.2d 748, 753-54 (Tenn. Crim. App. 1980). We are not persuaded that fingerprinting of the defendant in the presence of the jury was so inflammatory or prejudicial as to render the trial fundamentally unfair. We decline to grant relief on this basis.

## V. EXCLUSION OF HEARSAY EVIDENCE DURING PENALTY PHASE

During the penalty phase, defense counsel asked the defendant's father whether the defendant had expressed any remorse about the victim's death. The trial court sustained the state's objection based upon hearsay. On appeal, the defendant argues the trial court erred in excluding the evidence because hearsay evidence is admissible during the penalty phase of a capital trial and the defendant's remorse was a relevant consideration for the jury. He acknowledges he made no offer of proof at sentencing or at the hearing on the motion for new trial; however, he requests that this court remand the matter to the trial court to permit an offer of proof on this issue. *See* State v. Goad, 707 S.W.2d 846, 852-54 (Tenn. 1986).

The state correctly responds that the defendant has waived this issue by failing to make an offer of proof and for failing to raise this issue in his motion for new trial. *See* Tenn. R. App. P. 3(e); State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001). Moreover, our supreme court in Sims declined to remand for a further hearing after finding that, unlike the defendant in Goad, defendant Sims did not attempt to make an offer of proof. 45 S.W.3d at 15. Likewise, in the instant case, the defendant did not attempt to make an offer of proof. Thus, we could consider the issue waived. However, we opt to address the issue based upon the record before us.

The rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding. Carter, 114 S.W.3d at 903; State v. Stout, 46 S.W.3d 689, 702 (Tenn. 2001). However, any error on part of the trial court in excluding the testimony of the defendant's father was clearly harmless. The defendant, during his own testimony, expressed remorse for the victim's death. Additionally, he made the following statement to the jury:

> Ladies and gentlemen, I know that what I did was wrong, and I know me saying that I'm sorry to them and I'm sorry to my family won't bring [the victim] back. He wasn't a bad person. I was the bad person. But I ask you just please have mercy on me. I didn't mean for that to happen. I wasn't at home. Me and my family, we wasn't together. I was out in the streets. I didn't know what to do. I didn't know what was going on in my life. I just needed help from somebody – just please, please don't kill me - please.

We conclude the potential hearsay testimony about the defendant's expressions of remorse to his father would not have affected the jury's verdict. The defendant is not entitled to relief on this claim.

## VI. APPRENDI/RING ISSUE

Relying upon the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the defendant contends the trial court's factual finding and instruction that the statutory elements of his prior convictions involved the use of violence to the person deprived the jury of the opportunity to decide whether the prior offenses involved violence. In defense of the trial court, we preface our discussion by noting this trial occurred prior to the Ring

decision and by further noting the trial court followed the dictates of our state supreme court's decision in Sims, 45 S.W.3d at 11-12, which also was decided prior to Ring.

## A.  United States Supreme Court Decisions

In Almendarez-Torres v. United States, 523 U.S. 224, 226-27, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), a federal trial court in a non-capital case increased the petitioner's maximum sentence for his conviction for illegally returning to the United States after deportation based upon the court's finding that the deportation was subsequent to an aggravated felony conviction.  *See* 8 U.S.C. § 1326(a), (b)(2).  The petitioner argued that application of this provision to his conviction violated the Fifth Amendment because the prior aggravated felony convictions were not listed in his indictment.  Almendarez-Torres, 523 U.S. at 227; *see* U.S. Const. amend. V.  The United States Supreme Court concluded the provision did not define a separate offense but, rather, was a penalty provision which authorized the trial court to increase the sentence for a recidivist.  Almendarez-Torres, 523 U.S. at 226.  Accordingly, the court held the government was not constitutionally required to allege the petitioner's prior convictions in the indictment.  *Id.* at 226-27.

The court noted the subject matter of the provision related to recidivism and prior convictions are generally regarded as sentencing factors.  *Id.* at 230.  The court further noted our courts have traditionally relied upon recidivism as a basis for increasing a defendant's sentence.  *Id.* at 243.  Moreover, recidivism "does not relate to the commission of the offense, *but goes to the punishment only*, and therefore . . . may be subsequently decided."  *Id.* at 243-44 (*citing* Graham v. West Virginia, 224 U.S. 616, 624, 32 S. Ct. 583, 56 L. Ed. 917 (1912)) (emphasis in original).

In Apprendi, the petitioner challenged a state trial court's application of a hate crime provision to increase his sentence based upon his Sixth Amendment right to a jury trial and Fourteenth Amendment right to due process.  530 U.S. at 476-77; *see* U.S. Const. amend. VI, XIV. It did not address the Fifth Amendment issue relating to the validity of the indictment, which was the issue in Almendarez-Torres.  Apprendi, 530 U.S. at 477 n.3;  *see* U.S. Const. amend. V.  In invalidating the trial court's application of the hate crime provision, the court held "[o]ther than the *fact of a prior conviction*, any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt."  Apprendi, 530 U.S. at 490 (emphasis added).  Furthermore, in addressing the issue presented in Apprendi, the court declined to address the validity of its decision in Almendarez-Torres.  *Id.* at 489-90.

In Ring, the court extended its Sixth and Fourteenth Amendments holding in Apprendi to capital cases.  536 U.S. at 607.  The court specifically held that the jury, and not the trial judge, was required to find the aggravating circumstances necessary to impose the death penalty.  *Id.* at 609. However, because the aggravating circumstances applied to the petitioner in Ring did not relate to prior convictions, the court did not address its holding in Almendarez-Torres.  *Id.* at 597 n.4.

## B.  Tennessee Decisions

The state maintains the Tennessee Supreme Court's decision in State v. Dellinger, 79 S.W.3d 458 (Tenn.), *cert. denied,* 537 U.S. 1090 (2002), controls this issue.  In Dellinger, our state supreme

court declined to apply <u>Apprendi</u> to Tennessee's capital sentencing procedures. *Id.* at 467. First, the court noted that <u>Apprendi</u> does not apply to enhancement factors based upon prior convictions. *Id.* at 466. Second, the court reasoned that while <u>Apprendi</u> only applies to those enhancement factors which are used to impose a sentence above the statutory maximum, the death penalty in Tennessee is "within the statutory range of punishment prescribed by the legislature for first degree murder." *Id.*; *see* Tenn. Code Ann. § 39-13-202(c)(1). Third, the court concluded the due process and notice requirements are satisfied through Tennessee Rule of Criminal Procedure 12.3(b), which instructs district attorneys to notify capital defendants at least thirty days prior to trial of their intention to seek the death penalty and to list the aggravating circumstances upon which the state intends to rely. <u>Dellinger</u>, 79 S.W.3d at 467. Fourth, the court reasoned that <u>Apprendi</u> only applies to sentencing procedures which permit judges to sentence capital defendants, whereas a jury in our state must make the necessary findings regarding the statutory aggravating circumstances. *Id.* Finally, the court noted that in Tennessee, the jury is required to find any statutory aggravating circumstance beyond a reasonable doubt, thus, complying with the "reasonable doubt" standard articulated in <u>Apprendi</u>. *Id.*

However, we note that: (1) <u>Dellinger</u> was decided prior to <u>Ring</u>; and (2) the issue in <u>Dellinger</u> concerned the failure to charge the applicable aggravating circumstances in the indictment. *See id.* at 466. In <u>Carter</u>, 114 S.W.3d at 910 n.4, our state supreme court, citing <u>Dellinger</u>, declined to find error based upon <u>Apprendi</u> and <u>Ring</u>. However, like <u>Dellinger</u>, the issue in <u>Carter</u> involved the sufficiency of the indictment. *See id.* Moreover, other panels of this court have concluded that <u>Ring</u> did not affect our supreme court's holding in <u>Dellinger</u>. *See* <u>State v. Robert Faulkner</u>, No. W2001-02614-CCA-R3-DD, 2003 Tenn. Crim. App. LEXIS 836, at \*\*87-88 (Tenn. Crim. App. Sept. 26, 2003, at Jackson); <u>State v. Gdongalay P. Berry</u>, No. M2001-02023-CCA-R3-DD, 2003 Tenn. Crim. App. LEXIS 316, at \*\*16-17 (Tenn. Crim. App. Apr. 10, 2003, at Nashville), *appeal docketed*, No. M2001-02023-SC-DDT-DD (Tenn. 2003); <u>State v. Richard Odom</u>, No. W2000-02301-CCA-R3-DD, 2002 Tenn. Crim. App. LEXIS 871, at \*38 n.1 (Tenn. Crim. App. Oct. 15, 2002, at Jackson), *appeal docketed*, No. W2000-02301-SC-DDT-DD (Tenn. 2002). However, like <u>Dellinger</u> and <u>Preston Carter</u>, the issue in these cases involved the sufficiency of the indictment. *See* <u>Robert Faulkner</u>, 2003 Tenn. Crim. App. LEXIS 836, at \*82; <u>Gdongalay P. Berry</u>, 2003 Tenn. Crim App. LEXIS 316, at \*13; <u>Richard Odom</u>, 2002 Tenn. Crim. App. LEXIS 871, at \*32.

The defendant in the case at bar does not challenge the failure to allege the aggravating circumstance in the indictment. Rather, the defendant raises an issue involving the Sixth Amendment right to trial by jury and the Fourteenth Amendment right to due process of law, which were the same rights at issue in <u>Apprendi</u> and <u>Ring</u>. *See* <u>Apprendi</u>, 530 U.S. at 477 n.3; <u>Ring</u>, 536 U.S. at 595. Both <u>Apprendi</u> and <u>Ring</u> involved state prosecutions, and the appellants did not assert a constitutional claim based upon the omission of the sentencing enhancements or aggravating circumstances in the indictment. <u>Apprendi</u>, 530 U.S. at 477 n.3; <u>Ring</u>, 536 U.S. at 597 n.4. In <u>Apprendi</u>, the United States Supreme Court noted that the due process clause of the Fourteenth Amendment had not yet been construed to apply the Fifth Amendment right to indictment by a grand jury to the states. <u>Apprendi</u>, 530 U.S. at 477 n.3 (citations omitted).

## C.  Trial Court's Instruction

During the penalty phase, the trial court, after hearing the same testimony the jury heard concerning the underlying facts of the four prior felonies, instructed the jury as follows:

> Statutory Aggravating Circumstances: Tennessee law provides that no sentence of death or sentence of imprisonment for life without possibility of parole shall be imposed by a jury, but upon a unanimous finding that the state has proven, beyond a reasonable doubt, the existence of one or more of the statutory aggravating circumstances which shall be limited in this case to the following:

> That the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involved the use of violence to the person. *The state is relying upon the crimes of Robbery, Kidnapping, Reckless Endangerment, and Attempted Rape, which are felonies, the statutory elements of which do involve use of violence to the person.*

(Emphasis added).  Thus, the trial court concluded the underlying facts of the prior convictions involved "violence to the person" and instructed the jury, as a matter of law, that the statutory elements of these four offenses involved "violence to the person."

## D.  Analysis

Our state supreme court held in <u>Sims</u> that in determining whether the statutory elements of a prior felony conviction involved the use of violence against another for purposes of the (i)(2) aggravator, "the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied either with or without proof of violence."  45 S.W.3d at 11-12.  <u>Sims</u> found no error in the trial judge's determination that the two prior felony convictions were violent and in so instructing the jury.  *Id.*  Therefore, the trial court in the case at bar made the determinations required by <u>Sims</u>.  However, although <u>Sims</u> was filed after <u>Apprendi</u>, no <u>Apprendi</u> issue was raised by the defendant in <u>Sims</u>, nor was <u>Apprendi</u> discussed by our supreme court.  Further, <u>Sims</u> was decided prior to <u>Ring</u>.

In <u>State v. Powers</u>, 101 S.W.3d 383, 400-01 (Tenn.), *cert. denied*, __ U.S. __ (2003), the Tennessee Supreme Court reaffirmed the procedure provided in <u>Sims</u>.  In <u>Powers</u>, our state supreme court held that the 1998 amendment to Tennessee Code Annotated section 39-13-204(c), which expressly permits either party to introduce evidence regarding the facts and circumstances of a defendant's prior conviction which the jury may then consider in weighing the (i)(2) aggravating factor, was inapplicable to the case because the capital offense was committed prior to the effective date of the amendment.  *Id.* at 400.  However, we note that although <u>Powers</u> was filed after both <u>Apprendi</u> and <u>Ring</u>, no issue regarding <u>Apprendi</u> and <u>Ring</u> was raised by the defendant in <u>Powers</u>, nor was <u>Apprendi</u> or <u>Ring</u> discussed by our supreme court.

The question before this court is whether the Sixth and Fourteenth Amendments require the jury, not the trial judge, to make findings that must go <u>beyond the mere fact that a prior conviction</u>

-14-

exists in order to apply the (i)(2) aggravating circumstance. As applicable to the case at bar, it was necessary to determine not only that the prior convictions existed, but also that they involved violence. Otherwise, the aggravator could not be applied and the defendant would be ineligible for the death penalty.

Initially, we reject the state's contention that Apprendi and Ring are not applicable to the present case because imposition of the death penalty does not enhance the defendant's sentence for his first degree murder conviction beyond its statutory maximum. The United States Supreme Court expressly rejected this argument in Ring, concluding that the required finding of an aggravating circumstance exposed the defendant to a greater punishment than that authorized by the jury's verdict of conviction. Ring, 536 U.S. at 603-04. Thus, our state supreme court's reliance upon this factor in Dellinger, which was decided prior to Ring, appears to have been effectively overruled by Ring. *See id.*; Dellinger, 79 S.W.3d at 466.

Furthermore, the holding in Dellinger that the due process and notice requirements were satisfied through the provisions in Tennessee Rule of Criminal Procedure 12.3(b) relates to the sufficiency of the indictment, which is not at issue in this case. *See* Dellinger, 79 S.W.3d at 467. The court in Dellinger further held that Apprendi only applied to sentencing procedures which permit judges to sentence capital defendants, thus, exempting Tennessee from the requirements of Apprendi. *Id.* However, as previously noted, Dellinger was decided prior to Ring. In light of Ring, we question whether Tennessee has a blanket exemption from the right to trial by jury requirements of Apprendi and Ring based solely on the fact that we have jury sentencing in capital cases.

A disparity of views exists as to whether the trial judge can decide issues which involve an examination of the underlying facts of a prior conviction. On remand from the United States Supreme Court, the Arizona Supreme Court held that any additional factual findings necessary for application of the prior violent felony aggravator, "beyond the bare fact that a prior conviction exists," must be made by a jury. Arizona v. Ring, 65 P.3d 915, 939 (Ariz. 2003). However, some states have interpreted the United States Supreme Court's holding in Ring to allow a trial judge to determine factual issues relating to aggravating circumstances which involve prior convictions. *See* Belcher v. State, 851 So. 2d 678, 685 (Fla. 2003) (concluding Ring did not disturb the holding in Apprendi, which exempted prior convictions from facts required to be submitted to a jury), *cert. docketed*, No. 03-6522 (U.S. Sept. 24, 2003); Blackwelder v. State, 851 So. 2d 650, 654 (Fla. 2003) (noting the Florida Supreme Court had previously rejected claims under Apprendi and Ring concerning the prior felony conviction aggravator); State v. Williams, 97 S.W.3d 462, 474 (Mo.) (holding that a trial judge may determine as a matter of law whether a defendant's prior conviction involved "serious assaultive behavior" as an element of an aggravating circumstance), *cert. denied*, __ U.S. __ (2003); Walter Leroy Moody, Jr. v. State, No. CR-96-0994, 2003 Ala. Crim. App. LEXIS 90, at **182-83 (Ala. Crim. App. Apr. 18, 2003) (holding Apprendi and Ring did not prohibit a trial judge from finding that a defendant had a prior capital conviction or prior violent felony conviction as an aggravating circumstance), *cert. filed* (Ala. Apr. 30, 2003); Calvin L. Stallworth v. State, No. CR-98-0366, 2003 Ala. Crim. App. LEXIS 21, at *21 (Ala. Crim. App. Jan. 31, 2003) (concluding a trial judge may determine whether a defendant was under a sentence of imprisonment when he committed the capital offense), *cert. denied* (Ala. 2003).

To the extent that any of these holdings of our sister states might indicate that a trial judge in a capital case may make all findings regarding the underlying facts of prior convictions upon which the application of an aggravating circumstance depends, we note that issue has not been definitively decided by the United States Supreme Court. However, Apprendi requires that any "*fact*" which increases the penalty beyond the prescribed statutory maximum, "*other than the fact of a prior conviction*," must be submitted to a jury and found beyond a reasonable doubt. 530 U.S. at 490 (emphasis added). Further, Ring dictates that the death penalty is a penalty beyond the prescribed statutory maximum. 536 U.S. at 603-04. In regard to Tennessee's prior violent felony aggravating circumstance, Sims authorizes the examination of the underlying *facts* in order to determine whether the prior felonies were or were not, in fact, *violent*. 45 S.W.3d at 11-12. When a trial judge examines the underlying facts, factually determines that a prior offense involved violence, and then, based upon its finding of fact, instructs the jury as a matter of law that the prior felony involved violence, it is arguable that this usurps the role of the jury as trier of fact. Therefore, it is arguable the procedure outlined in Sims may well be in violation of Ring.

However, we need not rest our ultimate disposition in this case upon such a holding. We further realize this case will be automatically reviewed by our state supreme court. *See* Tenn. Code Ann. § 39-13-206(a)(1). Thus, we proceed to determine whether the trial court's action was harmless in the event it was error.

## E. Harmless Error

In Ring, the court noted, but did not reach, the issue of harmless error; rather, it remanded to the state court to make that determination. Ring, 536 U.S. at 609 n.7. In Neder v. United States, the Supreme Court held that constitutional errors can be harmless except in a very limited class of cases. 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). The court then set forth the following examples of the limited cases in which harmless error could not be found: Sullivan v. Louisiana, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (defective reasonable doubt instruction); Vasquez v. Hillery, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (racial discrimination in selection of grand jury); Waller v. Georgia, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (denial of public trial); McKaskle v. Wiggins, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (denial of self-representation at trial); Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (complete denial of counsel); Turney v. Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (biased trial judge). Neder, 527 U.S. at 8. We conclude the issue in the case at bar is subject to harmless error analysis as implied in Ring. In order to find harmless constitutional error, harmlessness must be shown "beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

During the penalty phase, the jury heard the detailed and horrid testimony of the victim of the four prior offenses. Each of the offenses involved the defendant's use of a deadly weapon, to wit: a firearm, which was pointed at the victim. The defendant in his testimony at the penalty phase conceded that the underlying facts of these offenses were correct. Unquestionably, all four offenses involved the use of violence to the person. The jury expressly wrote each of the prior four felonies on its verdict form and found that this aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. We conclude, beyond a reasonable doubt, that any

-16-

rational juror would have found that the prior felonies involved violence to the person. Accordingly, if there were error in not allowing the jury to make the determination that these were violent felonies, it was harmless beyond a reasonable doubt.

## VII. INSTRUCTION ON VICTIM IMPACT EVIDENCE

At the conclusion of the penalty phase, the trial court provided an instruction to the jury relative to its consideration of victim impact evidence, which included the following:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.

> Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

The defendant complains this instruction amounts to an undue intrusion into the exclusive province of the jury. He argues there is a reasonable probability that it coerced a death sentence because the instruction informed the jury not to consider victim impact evidence unless it had already found that death was the appropriate punishment.

This exact instruction was recommended by our supreme court in Nesbit, 978 S.W.2d at 892, and discussed by the high court in State v. Reid, 91 S.W.3d 247, 283 (Tenn. 2002). The high court specifically noted in Reid that any contradiction arising between the instruction and the statute inured to the benefit of the defendant. 91 S.W.3d at 283. This issue lacks merit.

## VIII. SUFFICIENCY OF THE (i)(2) AGGRAVATING CIRCUMSTANCE

In seeking the death penalty, the state asserted only one aggravating circumstance, that the defendant "was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." *See* Tenn. Code Ann. § 39-13-204(i)(2). The proof at the penalty phase established the defendant had prior convictions for robbery, kidnapping, felony reckless endangerment, and attempted rape, all arising from one incident with a single victim. The jury found beyond a reasonable doubt that the (i)(2) aggravating

circumstance existed and that it outweighed any mitigating circumstances. On appeal, the defendant contends his prior offenses are not crimes whose statutory elements necessarily involve the use of violence to the person, and the court may not look at the underlying facts of the prior convictions to determine whether the felonies involved the use of violence to the person. He further contends that even if the aggravating circumstance was established, it did not outweigh the mitigating circumstances beyond a reasonable doubt.

## A. <u>Sims</u> Holding and Tennessee Code Annotated Section 39-13-204(c)

In <u>State v. Sims</u>, our supreme court held that when the statutory elements of a prior felony conviction may be satisfied either with or without proof of violence, then an examination of the underlying facts is necessary to determine whether the (i)(2) aggravating circumstance exists. 45 S.W.3d at 11-12. We also note that Tennessee Code Annotated section 39-13-204(c) was amended in 1998, is applicable to this case, and provides in pertinent part as follows:

> In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.

*See* 1998 Tenn. Pub. Acts, ch. 915, § 1. Therefore, the defendant's argument that the actual facts of the prior felonies may not be considered is without merit.

With regard to these prior felonies, the indictments charged aggravated robbery, especially aggravated kidnapping, felony reckless endangerment, and aggravated rape. The indictments alleged that each of these offenses was accomplished by the use of a "deadly weapon, to wit: a firearm." The defendant pled guilty to simple robbery, simple kidnapping, felony reckless endangerment, and attempted rape.

## B. Statutory Elements of the Prior Offenses

We now proceed to determine whether the four prior offenses qualify as crimes of violence. Our state supreme court has defined "violence" as "physical force unlawfully exercised so as to injure, damage, or abuse." <u>State v. Fitz</u>, 19 S.W.3d 213, 217 (Tenn. 2000).

"Robbery is the intentional or knowing theft of property from the person of another by violence or placing the person in fear." Tenn. Code Ann. § 39-13-401(a). Kidnapping is false imprisonment of the victim under circumstances which expose the victim to substantial risk of bodily injury. *Id.* § 39-13-303(a)(1). Felony reckless endangerment is committed when one recklessly places another person in imminent danger of death or serious bodily injury through the

use of a deadly weapon. *Id.* § 39-13-103. Attempted rape is the attempted unlawful sexual penetration of a victim accompanied by force or coercion. *Id.* §§ 39-12-101(a)(3), -13-503(a)(1). "Force" involves "compulsion by the use of physical power or violence." *Id.* § 39-11-106(a)(12). We conclude that the statutory elements of each of the offenses to which the defendant pled guilty may or may not involve the use of violence, depending upon the underlying circumstances.

## C. Underlying Facts

Darrell Webster, the victim of the prior offenses, testified that all of the offenses were accomplished through the defendant's use of a gun. According to Webster, the defendant pointed a gun at him when he forced him to surrender control of the car and move from the driver's seat to the passenger's seat. The defendant spun the barrel of the gun, pointed it at the victim's head, and pulled the trigger in "Russian Roulette" fashion. At some point during the five-hour encounter, the gun-wielding defendant forced Webster to perform oral sex upon him. Additionally, the defendant and his accomplice engaged in conversation indicating that they were going to kill Webster and discussed where they could dump his body. Pointing a gun at a victim is a violent act. *See* State v. Allen, 69 S.W.3d 181, 186 (Tenn. 2002). In determining whether an aggravating circumstance was established beyond a reasonable doubt, we review the evidence in a light most favorable to the state. Suttles, 30 S.W.3d at 262. Without question, Webster's testimony was sufficient to establish that the defendant engaged in physical force so as to abuse the victim with regard to each of these offenses. *See id.* Thus, the state's evidence was sufficient to establish the (i)(2) aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(i)(2).

## D. Weighing of Aggravating and Mitigating Circumstances

We further reject the defendant's contention that the aggravating circumstance did not outweigh the mitigating circumstances beyond a reasonable doubt. This was a question for the jury, and we conclude the evidence was sufficient to support the jury's determination.

## IX. VERDICT FORM AS TO AGGRAVATING CIRCUMSTANCE

The jury was instructed on the statutory aggravating circumstance as follows:

That the defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involved the use of violence to the person. The state is relying upon the crimes of Robbery, Kidnapping, Reckless Endangerment, and Attempted Rape, which are felonies, the statutory elements of which involve the use of violence to the person.

*See* Tenn. Code Ann. § 39-13-204(i)(2). The verdict form returned by the jury during the penalty phase of the defendant's trial reads as follows:

PUNISHMENT OF DEATH

(1) We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances:

(Here list the statutory aggravating circumstance or circumstances so found, which <u>must be limited</u> to those enumerated for your consideration by the court in these instructions.)

<u>Robbery</u>
<u>Kidnapping</u>
<u>Reckless endangerment</u>
<u>Attempted rape</u>

_____. . .

The defendant contends that this constitutes an incomplete and erroneous verdict because (1) none of these four crimes are listed as an aggravating circumstance, and (2) the jury did not find that the crimes were those whose statutory elements involve the use of violence to the person. The defendant has waived his right to challenge this issue on appeal as he failed to object to the jury's verdict and failed to raise the issue in his motion for new trial. <u>State v. McKinney</u>, 74 S.W.3d 291, 303 n.5 (Tenn. 2002). Regardless, we elect to address the merits of this issue based upon the record before us.

The jury's verdict need not be a verbatim statement of the aggravating circumstance relied upon by the state. <u>State v. Jerry Ray Davidson</u>, ___ S.W.3d ___, ___, 2003 Tenn. LEXIS 1007, at **43-44 (Tenn. Oct. 20, 2003). A verdict is valid if it clearly indicates that the jury found the elements of the aggravating circumstance or circumstances relied upon by the prosecution; the aggravating circumstances found are those clearly authorized by statute; and the verdict is sufficient to permit effective appellate review of the sentence. <u>McKinney</u>, 74 S.W.3d at 303.

The jury's verdict in the case under review is similar to the verdict form returned by the jury in <u>McKinney</u>, where the state also relied solely upon the (i)(2) aggravating circumstance. *See id.* In <u>McKinney</u>, the verdict form read, in part, "We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances: aggravated robbery." *Id.* Our supreme court held the verdict was sufficient. *Id.* In the instant case, like <u>McKinney</u>, only the (i)(2) aggravating circumstance was charged to the jury; the trial court's instruction tracked the statutory language; and the verdict specifically cited the prior offenses relied upon by the state and instructed by the court. Moreover, in the case *sub judice*, the trial court questioned the jury to clarify its intent, stating:

. . .[Y]ou have written in there:

"Robbery, Kidnapping, Reckless Endangerment, and Attempted Rape," which, for the record, are the four offenses listed on the charge as the aggravating circumstance, although you have not written the entire

-20-

language as reflected on the charge, an aggravating circumstance. I assume that in writing these four offenses on here you have determined that the aggravating circumstance, as written on the charge, has been proven beyond a reasonable doubt. Is that correct?

The jury foreman responded in the affirmative. We conclude that the jury form in this case was clear and unequivocal. The defendant is not entitled to relief on this claim.

## X. CONSTITUTIONALITY OF THE TENNESSEE DEATH PENALTY SCHEME

The defendant argues Tennessee's death penalty statutes are unconstitutional and the death penalty is imposed capriciously and arbitrarily. The Tennessee courts have repeatedly upheld the constitutionality of our state's death penalty statutes. *See*, *e.g.,* Reid, 91 S.W.3d at 312-14; State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995), *cert. denied,* 519 U.S. 847 (1996). Further, the courts of our state have rejected the defendant's arguments that Tennessee's procedures for implementing the death penalty allow it to be imposed capriciously and arbitrarily. *See, e.g.,* Hines, 919 S.W.2d at 582; State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), *cert. denied,* 513 U.S. 1020 (1994); State v. Cazes, 875 S.W.2d 253, 268, 270-71 (Tenn. 1994), *cert. denied,* 513 U.S. 1086 (1995); State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992), *cert. denied,* 507 U.S. 954 (1993); State v. Thompson, 768 S.W.2d 239, 250-52 (Tenn. 1989), *cert. denied,* 497 U.S. 1031 (1990).

The defendant contends the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-2-203(i)(2), (5), (6), and (7) have been so broadly interpreted that they fail to provide a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. However, factors (i)(5), (6) and (7) do not pertain to this case. Further, our courts have previously concluded that the (i)(2) aggravating circumstance provides a meaningful basis for narrowing the class of death eligible defendants. *See, e.g.,* State v. Austin, 87 S.W.3d 447 app. at 487 (Tenn. 2002), *cert. denied,* ___ U.S. ___ (2003); Vann, 976 S.W.2d at 117; State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994). This issue is without merit.

## XI. COMPARATIVE PROPORTIONALITY REVIEW

The defendant contends his death sentence is disproportionate to the penalty imposed in similar cases. It is this court's statutory responsibility to make this proportionality determination, considering "both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D); State v. Godsey, 60 S.W.3d 759, 781 (Tenn. 2001). The comparative proportionality review is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is disproportionate to the punishment imposed on others convicted of similar crimes. State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997). A sentence is disproportionate only if it is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Id.* at 668.

In conducting our proportionality review, we compare the present case with cases involving similar defendants and similar crimes. Terry v. State, 46 S.W.3d 147, 163-64 (Tenn. 2001). We select only from those cases in which a capital sentencing hearing was actually conducted. *See* State

v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000). We begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. *See* State v. Powers, 101 S.W.3d 383, 403 (Tenn. 2003) (citing State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998)).

Regarding the circumstances of the crime itself, numerous factors are considered, including: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of provocation; (7) the absence or presence of premeditation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Stout, 46 S.W.3d at 706. We also consider numerous factors regarding the defendant, including: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *See* Bland, 958 S.W.2d at 667.

In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Terry, 46 S.W.3d at 164. Likewise, a death sentence is not disproportionate merely because the circumstances of the offense were similar to those of a crime for which another defendant received a life sentence. Hall, 976 S.W.2d at 135. Our function is not to limit our comparison to those cases where a death sentence "is perfectly symmetrical," but rather, our objective is only "to identify and to invalidate the aberrant death sentence." Bland, 958 S.W.2d at 665.

The circumstances surrounding the case under review, in light of the relevant comparative factors, are that the twenty-year-old defendant directed the twenty-seven-year-old victim to a secluded, grassy area behind an apartment complex. The defendant, upset because the victim had not repaid a small debt, held a gun to the victim's head and told the victim to open his mouth. As the victim began to back away, the defendant, without provocation or justification, premeditatedly shot the unarmed, helpless, retreating victim in the head. In order to ensure the victim was dead, the defendant then placed the gun within an inch of the victim's head and shot him again. He then retrieved the victim's car keys from the victim's body and escaped in the victim's car. After the murder, the defendant said the victim owed him fifteen dollars and needed to "start respecting" him. Subsequently, the defendant fled from officers and misrepresented that he would turn himself in. He was later arrested.

In 1997, the defendant pled guilty to robbery, kidnapping, felony reckless endangerment, and attempted rape for crimes he committed in 1995 when he was fifteen years old. All offenses involved the use of a firearm and arose from a single incident during which the defendant and an accomplice kidnapped the victim. During the episode, the defendant held a gun to the victim's head, spinning the chamber and pulling the trigger in Russian Roulette fashion. The defendant discussed plans to "put a cap" in the victim and discussed where the body should be discarded. The defendant, while holding the gun, ordered the victim to perform oral sex upon him. The ordeal, which lasted approximately five hours, culminated with the victim's fortuitous escape.

Evidence presented at the sentencing phase established the defendant's parents were loving and supportive. Despite his apparently secure home life, the defendant was unable to obey family

rules and moved out of his parents' home. The defendant has a small daughter who currently resides with his parents. At sentencing, the defendant expressed remorse for the murder.

Our supreme court has upheld the death penalty in numerous cases where a defendant shot an unarmed victim from close range without provocation. *See, e.g.*, McKinney, 74 S.W.3d at 299 (defendant shot unarmed victim in back of neck); Stout, 46 S.W.3d at 707 (defendant shot victim in head); Sims, 45 S.W.3d at 6 (defendant shot unarmed victim in back of head); State v. Henderson, 24 S.W.3d 307, 310 (Tenn. 2000) (defendant shot deputy sheriff in back of head at "point-blank range"); Bland, 958 S.W.2d at 670 (defendant shot unarmed, "unresisting, retreating victim").

Our review of similar cases further reveals our state courts have often upheld death sentences based solely on the aggravating circumstance of a prior violent felony conviction pursuant to Tennessee Code Annotated section 39-13-204(i)(2). *See, e.g.,* McKinney, 74 S.W.3d at 301 (one prior violent felony conviction for aggravated robbery); State v. Chalmers, 28 S.W.3d 913, 916 (Tenn. 2000) (prior violent felony convictions for attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175, 180 (Tenn. 2000) (prior violent felony convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6, 10 (Tenn. 1999) (prior violent felony convictions for robbery and first degree murder). Moreover, the prior violent felony aggravator is "more qualitatively persuasive and objectively reliable" than other aggravating circumstances. McKinney, 74 S.W.3d at 313 (quoting State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993)).

The defendant's primary contention is that his death sentence is disproportionate because he was a fifteen-year-old juvenile at the time of his prior offenses, and, therefore, the prior violent felony aggravator cannot outweigh the mitigating circumstances. In State v. Christopher A. Davis, No. M2001-01866-CCA-R3-DD, 2003 Tenn. Crim. App. LEXIS 250, at *57 (Tenn. Crim. App. Mar. 25, 2003, at Nashville), *appeal docketed*, No. M2001-01866-SC-DDT-DD (Tenn. 2003), the defendant sought to prevent the state from relying upon a murder he committed at the age of seventeen in order to establish the prior violent felony aggravating circumstance. Davis argued that just as a juvenile transferred to criminal court is ineligible for the death penalty, an offense committed by a juvenile could not support an aggravating circumstance in a subsequent capital case. *Id.* This court recognized that while Tennessee Code Annotated section 37-1-134(a) renders a juvenile transferred to criminal court and tried as an adult ineligible for the sentence of death, it does not preclude a transferred juvenile's conviction in criminal or circuit court from forming the basis for an aggravating circumstance. *Id.* at *58. Additionally, the court noted that the (i)(2) aggravator does not limit prior violent felonies to convictions for crimes committed by adults. *Id.* Accordingly, the fact that the defendant was a juvenile at the time the prior felonies were committed is insufficient, standing alone, to render his sentence of death disproportionate.

Further, in addition to Christopher A. Davis, our state courts have upheld other death sentences based on the prior violent felony aggravating circumstance supported by at least one felony committed when the defendant was a juvenile. *See* Richard Odom, 2002 Tenn. Crim. App. LEXIS 871, at *127 (murder committed when defendant was seventeen); State v. Coleman, 619 S.W.2d 112, 115 (Tenn. 1981) (per information on Rule 12 Database, defendant was sixteen when he committed assault with intent to commit robbery with a deadly weapon). The defendant in the

instant case attempts to distinguish his circumstances on the basis that he was only fifteen years old and, therefore, less culpable than an older juvenile, when he committed the prior violent felonies. The jury was instructed that the defendant's age at the time of the commission of the prior offenses could be considered a mitigating circumstance. Nevertheless, the jury concluded the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. In conducting our review, we conclude the defendant's age at the time of the prior offenses does not diminish his culpability to a degree that his death sentence is disproportionate.

Our review of similar cases and defendants reveals that the sentence of death imposed upon the defendant is proportionate to the penalty imposed in those cases. We have considered the entire record and conclude the sentence of death was not imposed arbitrarily; the evidence supports the finding of the (i)(2) aggravating circumstance; the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt; and the sentence is not excessive or disproportionate.

## CONCLUSION

After a careful review of the record, we affirm the premeditated first degree murder conviction and the sentence of death.

_____
JOE G. RILEY, JUDGE

-24-